ISING v. WARD.

5-2042

Opinion delivered February 29, 1960

· *Sexton, Holland & Morgan* and *White & Martin,* for appellant.

*Warner, Warner & Ragon, Ralph W. Robinson,* for appellee.

GEORGE ROSE SMITH, J. The appellant, Lois Ward Ising, and the appellee, Harry Ward, were formerly husband and wife and are the parents of a three-year-old daughter, whose custody was awarded to the mother. This is an application by Mrs. Ising for permission to take the child to Oklahoma, where Mr. and Mrs. Ising wish to establish their home. The chancellor denied the application upon the sole ground that the Isings' new home, which is situated on a steep hill overlooking a lake, would not be physically safe for a small child. We have concluded that the application should have been granted.

At the outset we recognize, as did the chancellor, that the parent having custody of a child is ordinarily entitled to move to another state and to take the child to the new domicile. As we said in a similar case: "We do not think that the Chancellor erred in refusing to require appellee [the mother] to remain somewhat a prisoner in Arkansas because of the unfortunate divorce proceeding." *Antonacci* v. *Antonacci,* 222 Ark. 881, 263 S. W. 2d 484; see also *Thompson* v. *Thompson,* 213 Ark. 595, 212 S. W. 2d 8; *Nutt* v. *Nutt,* 214 Ark. 24, 214 S. W. 2d 366; *Langston* v. *Horton,* 229 Ark. 708, 317 S. W. 2d 821. In our earlier cases the objection to an application of this kind has usually sprung from the loss of visitation rights that the protesting parent would suffer upon the child's departure. That point is not involved here, for the proposed home in Oklahoma is not so far from Fort Smith as to interfere with the appellee's decreed right to have his daughter with him every other week end.

After having been married about eight years the Wards were divorced on March 27, 1959. Ward was then 67 years old; his wife was 27. Mrs. Ward received a property settlement and was awarded the custody of her infant daughter. There does not seem to have ever

been any serious question about this mother's fitness to have the care of her child. On this issue the record is replete with evidence indicating that the award of custody was correct; indeed, Ward candidly admits that his former wife is a devoted mother who takes excellent care of the little girl.

On June 12, some two and a half months after the entry of the divorce decree, Mrs. Ward married Orman Ising, aged 32, who was then living in Fort Smith. Ising testified that he and a partner had invested about $60,000 in the purchase of a boating and fishing dock on Lake Tenkiller in Tenkiller State Park, Oklahoma, which is about fifty miles from Fort Smith. Ising and his partner devote their time to the enterprise, which is said to be profitable.

On June 23 Mrs. Ising filed a petition asking that she be permitted to take her child to a home that her husband had rented in Sallisaw, Oklahoma. At the first hearing upon this petition the chancellor found, with justification, that the Sallisaw rental arrangement had not been made in good faith and was actually a subterfuge. Upon this finding the court refused to approve the petition, but the matter was continued to allow the Isings to show that a suitable home would be provided in Oklahoma.

At the two subsequent hearings Mrs. Ising abandoned the Sallisaw proposal and sought the court's permission to move to a trailer located near the dock at Tenkiller Lake. This mobile home, which Ising bought new for $4,675, comprises a living room, kitchen, bathroom, and three bedrooms. It is equipped with electricity and running water. A social worker in the child welfare division of Sebastian county inspected the trailer and, after describing it in detail, testified that it was a fit, proper, and safe place for a three-year-old child. We find no reason to doubt that the trailer itself would be a suitable, comfortable home for the Isings and the child.

The chancellor's disapproval was based solely upon the trailer's location. It sits on a hill or ridge, from

fifty to a hundred yards from the edge of the lake. Interested witnesses describe the descent to the water as a bluff or precipice, but we regard this as an exaggeration. Mabry, the park superintendent who lives within a hundred yards, testified that there is a drop of six or seven feet at the top and then a gradual slope down to the lake. This witness, who has children aged five and two, says that the slope in front of his own home is steeper than that in front of the Ising trailer and that he has not erected a fence along the edge, as Ising has done.

We are unable to agree with the appellee's insistence that the slope of the ridge and the nearness of the deep lake present such hazards to a three-year-old child that the appellant's petition should be denied. If one is inclined to be fearful the threat of danger can be discovered everywhere, in the crowded streets of the city or, as here, in the comparative seclusion of the countryside. We know, however, that in Arkansas and throughout America thousands and thousands of children, representing many generations, have grown up from infancy next to rivers, to lakes, to mountain slopes, and to countless other natural conditions fully as hazardous as those existing near Tenkiller Lake. An attempt to shelter a growing child from every possible danger is manifestly futile, and it is certain that complete security cannot be achieved by means of a court decree. In practice the responsibility for choosing a child's environment must ordinarily rest upon the parent having custody of the child. The normal love of a parent, especially of a mother, for her child provides the best possible assurance that the infant will not be needlessly exposed to danger. We find in this record no proof to persuade us that the appellant cannot be relied upon to look after her daughter in the new home that she and her husband wish to occupy.

The decree is reversed and the cause remanded for the entry of a decree granting the appellant's petition. It will be appropriate for the chancellor to require a bond from the appellant, within her means, to protect the appellee's rights of visitation, and the burden of pro-

viding the child's transportation to and from her visits to Fort Smith should be fixed by the court's decree.

HARRIS, C. J., and McFADDIN and JOHNSON, JJ., dissent.

ED. F. McFADDIN, Associate Justice, (Dissenting). In deciding the present case the Chancellor remarked that these child custody cases are "the toughest cases we have to decide"; and I thoroughly agree with that remark. At the conclusion of the evidence, the Chancellor delivered an oral opinion, which occupies six pages in the transcript, and shows rather clearly how the appearance of the witnesses had impressed the Chancellor. I am unwilling to reverse his opinion in a close case like this one, when I see only the printed page.

Remember: no one is trying to take the custody of the child from the mother. The father of the child had made a substantial settlement on the mother so she could have a nice home in Fort Smith and have the child reared in a good community, with access to churches, schools, playmates, and doctors. But the mother married a younger man, and now wants to be with the new husband, which necessitates taking the child to live in a trailer on the banks of a lake, miles from churches, schools, playmates, or doctors.

The mother's first duty is to her child. The mother should stay in Fort Smith and raise her child under proper surroundings, and cease living in a trailer on the banks of a lake in order to be near her new husband. The obligations of her parenthood should be held to impose a superior duty on the mother. I would affirm the Chancery decree, which prevented the mother from removing the child from Arkansas.